1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                  NORTHERN DISTRICT OF CALIFORNIA

8

9   EDWARD J. MUNOZ,                        No. C 09-4941 MHP (pr)

10              Petitioner,                 **ORDER DENYING HABEAS**
                                            **PETITION AND GRANTING**
11        v.                                **CERTIFICATE OF APPEALABILITY**
                                            **IN PART**
12   M. D. McDONALD, warden,

13              Respondent.
    _____/
14

15                          **INTRODUCTION**

16        Petitioner filed a <u>pro se</u> action seeking a writ of habeas corpus under 28 U.S.C. §

17   2254.  Respondent has filed an answer and lodged the record with the court.  Petitioner has

18   not filed a traverse.  The matter now is before the court for consideration on the merits.  For

19   the reasons discussed below, the petition will be denied.

20                           **BACKGROUND**

21        Petitioner was convicted in Lake County Superior Court of first degree murder with a

22   criminal street gang special circumstance.  The jury also found that he had personally used a

23   dangerous or deadly weapon.  He was sentenced to life imprisonment without the possibility

24   of parole.

25        The state appellate court provided this summary of the evidence:

26        Leah Leister lived in the Clearlake Apartments with her five-year-old son. She
          was a daily methamphetamine user and other people often used the drug in her
27        apartment.  On the morning of March 11, 2002, Nichole McGall found Leister dead in
          her bedroom having received a total of 17 stab wounds in her neck, torso and
28        extremities.  McGall was a friend who had spent the night at Leister's and had fallen

into a deep sleep on her living room couch after using methamphetamine for two days. A plastic bag was partially draped over Leister's head and her hands and feet were bound with duct tape. A glass methamphetamine pipe lay next to her body. There was a substantial amount of blood on the bed and floor where the body was lying.

Appellant, who had been romantically involved with Leister, often stayed with his current girlfriend Desiree Lopez at her apartment in the same complex. Both appellant and Lopez were methamphetamine users and appellant sometimes went to Leister's apartment to socialize and smoke methamphetamine. John Jackson, who was on parole at the time, frequently stayed with his girlfriend Kathaleen McDaniel at the Clearlake Apartments. Jackson and McDaniel were also methamphetamine users. Jackson had met appellant about a month before Leister's murder and they occasionally used methamphetamine together. The day after the murder, Jackson went to the town of Gerber to find a new home, and about a week later, appellant helped him move there.

Detective Hermann of the Clearlake Police Department conducted an initial interview with appellant about the murder on March 22, 2002. Appellant said Leister's death was drug-related and she had "pissed people off," but denied that he was involved. He claimed to have been at his girlfriend's apartment on the night Leister was killed.

Jackson was also interviewed by police after his arrest on a parole violation. He was reluctant to speak because he feared retaliation. Jackson was told he would not be appointed an attorney because he was in custody on a parole violation only. He was advised his statements would not be used against him. No promises were made that he would not be prosecuted, although he was promised that he could serve the sentence for his parole violation in county jail instead of prison due to his safety concerns. Jackson told the officers his version of events and was visibly upset and shaken when he described what had happened.

Detective Hermann interviewed appellant again on April 15, 2002, after Jackson spoke to them. Appellant said he knew who had killed Leister but was afraid to talk. He told police that Jackson had killed Leister because she was "screwing over too many people" and a lot of the "dope" she sold belonged to "Northern." [FN2. As will be explained in greater detail later in this opinion, "Northern" appears to be a reference to the Nuesta Familia prison gang, the affiliated Norteños street gang, and the associates of these organizations.] On the night of the murder, Jackson had met appellant at Lopez's apartment and told him that "they" wanted everyone in Leister's apartment killed, including Leister, her son and her guest McGall. Appellant protested that he was not going to have Leister's son killed. Jackson told him to talk to the "homies" and soon after "the homies" called. They acquiesced to appellant's request to spare the boy, but said appellant would have to be punished for failing to follow orders.

According to appellant, Jackson left and came back at about 3:00 a.m. He had a bulge in his pocket that appellant assumed to be duct tape. They went to Leister's apartment and met her at the front door. She let them in and Jackson asked to buy some drugs. McGall was sleeping in the living room. Jackson went into Leister's bedroom while appellant went to the bathroom. When appellant came out of the bathroom and went into Leister's bedroom, she had already been killed and Jackson was putting a bag over her head. Jackson said he had stabbed her once to get the "air hole." Appellant was not sure why McGall, who was asleep on the couch, was not killed as well; it might have been because appellant was telling Jackson to hurry up and leave.

2

Appellant told Detective Hermann that after the killing, Jackson told him to get rid of their clothes. They went back to their apartments to change and Jackson handed him his clothing in a white trash bag. Appellant got blood on his own clothes from handling Jackson's clothing. He put his own clothes in a separate bag, put both bags in a laundry basket, and hid the clothes on the reservation. He agreed to show the police where he had dumped the clothing.

At appellant's direction, Detective Hermann and other officers went to a wooded area on the Elem Indian Colony about seven or eight miles from the Clearlake Apartments where the murder was committed. They found appellant's clothes, including a pair of jeans and a sweatshirt, scattered on the ground. Inside the pockets of the jeans was a roll of duct tape that had almost been used up and was smeared with blood. Under the jeans was a folded buck knife with blood stains on the handle and blade, as well as a torn photograph of appellant. Jackson's clothes, including his nylon jogging pants and a hooded sweatshirt, were inside a plastic bag.

Detective Hermann examined the clothing at the station and found wet blood stains on the crotch and leg area of appellant's jeans. A large amount of blood was on the front of appellant's sweatshirt and on the ends of its sleeves, and a few spots of blood were on appellant's white belt. The only blood found on Jackson's clothing was a spot about the size of a dime on his nylon jogging pants.

After the clothing was recovered, appellant agreed to continue the interview with Detective Hermann. He told him Leister's apartment was a halfway house used by Northerners for drugs. Leister had been "pinching" people's bags by mixing the drugs with baking powder or baking soda, and she had "burned" some Northerners for about a quarter ounce of methamphetamine. For this reason, an order to kill her had issued from Pelican Bay prison. Appellant did not know who made the order, but he received a phone call from Northern homies who told him to go with Jackson and help him. Jackson was supposed to kill Leister and her friend McGall, and appellant was supposed to kill Leister's son, but he protested. Appellant said he had no choice but to go with Jackson because he would have been killed if he had refused.

Appellant told Detective Hermann that he went to the bathroom after they arrived at Leister's apartment and when he came out, Leister was lying on the floor with her legs taped together and Jackson was putting a bag over her head. He did not help Jackson or come in contact with the body. Appellant explained that he got blood on his clothing when he threw his clothes in the same bag as Jackson's. Appellant also described a second version of events to Detective Herman, in which he saw Jackson approach Leister from behind and slit her throat. Leister tried to walk toward appellant but fell, and he got blood on his clothing when he caught her. Appellant gave her a hug because he didn't know what else to do.

Appellant was charged with murder accompanied by a criminal street gang special circumstance and an allegation that he had personally used a knife in the commission of the offense. (§§ 187, subd. (a), 190.2, subd. (a)(22), 12022, subd. (b)(1).) The case proceeded to a jury trial at which the following evidence (in addition to that already described) was presented:

Dewey Barnes, Jr. was visiting Desiree Lopez's apartment on the night of the murder. He noticed that appellant had a large roll of duct tape and a knife and was acting paranoid. According to Lopez, appellant left the apartment and later returned, telling Lopez to go to bed as he walked into the bathroom. Lopez initially told police that she saw blood on appellant when he returned, but testified that at trial that she did not see any blood.

3

Kathaleen McDaniel reported that on the night of the murder, appellant came to see Jackson at her apartment. Appellant and Jackson left and when Jackson returned 20 or 30 minutes later, McDaniel saw him go into the bedroom to change his clothes. He put the clothes in a plastic bag and handed them to appellant outside the apartment.

Jackson testified that when appellant came to his apartment on the night of Leister's murder, he told Jackson he was going to Leister's to beat up a man named Gilly or Gilberto. [FN3. Gilberto Lopez was a friend of Leister's and visited her apartment on the day of the murder. Gilberto Lopez testified at trial that he did not know appellant or Jackson.] Appellant wanted Jackson to watch his back, and Jackson agreed because they were both affiliated with the Northerners. Jackson had associated with Northerners in prison but not on the streets, and he knew appellant was a Northerner because of his tattoos and because appellant had told him so.

Jackson met up with appellant in front of Leister's apartment as appellant was knocking at her door. Leister came up behind them and let them in. McGall was sleeping on the couch. Leister, appellant and Jackson went into Leister's bedroom and closed the door, and she started to pack a pipe with methamphetamine. Appellant removed a knife from behind his leg, walked over to Leister, grabbed her by the hair, pulled her head back, whispered something in her ear, and ran the knife across her throat. Leister fell back on the bed and appellant repeatedly stabbed her upper body as she begged him to stop and reminded him she had a son. Appellant told her, "Shut up. If not, the boy dies too." Jackson left the bedroom because he was scared and did not want to be involved. He heard the struggle continue inside the bedroom. Thinking that someone was knocking at the front door, he returned to the bedroom where appellant was still stabbing Leister.

Appellant held Leister's head and made a jerking motion as if to break her neck and told Jackson, "She won't die." He handed the knife to Jackson and Jackson stabbed Leister's neck because he believed that appellant wanted him involved to "keep the secret safe." Appellant grabbed Leister's feet and Jackson taped them and gave appellant back the roll of tape. He told Jackson, "That's the way they want it."

As they were leaving the apartment, appellant pointed to McGall where she lay on the couch and said she should also be killed, but Jackson told him, "Let's just go." Appellant was covered in blood and they went back to their apartments and changed clothes. Jackson gave his clothes to appellant in a plastic bag.

The clothing that appellant and Jackson were wearing on the night of the murder (which, as discussed earlier, was recovered by police with appellant's assistance) was analyzed by a forensic DNA analyst who concluded that the blood found on appellant's sweater and jeans and Jackson's sweatpants was Leister's. A forensic criminalist concluded that whoever was wearing the sweater and jeans had closer contact with the victim than the person who wore the nylon sweatpants. The forensic criminalist concluded that the blood on the crotch and thigh area of appellant's jeans were consistent with straddling the victim during the stabbing, and it was unlikely the person who committed the crime would have only a few drops of blood on his clothing. Hairs found on the blade of the knife recovered with the clothing matched Leister's and appellant's right thumb print was found on the knife.

Steven Kinney had been incarcerated with appellant in the Lake County Jail in March or April of 2004. They had a number of conversations in which appellant said he had killed the "bitch" or "fucking bitch" by stabbing her in the bedroom. Appellant seemed to enjoy what he had done and said he planned to put the blame on his crime partner, who had been in another room at the time of the killing. Kinney was soon to

4

be released, and appellant offered him $5,000 plus some methamphetamine to kill his girlfriend (Lopez) because she was "a rat" who had told police he returned home covered with blood on the night of the murder. Asked about the child appellant had with his girlfriend, appellant told Kinney, "Kill the kid, too."

A special agent from the Department of Corrections and Rehabilitation testified as a gang expert and offered an opinion that appellant was an active participant in the Norteños gang and that the murder of Leister was committed to further the activities of the Norteños.

Appellant testified at trial and claimed that on the day of the murder, he decided to go to Leister's apartment to beat up Gilberto Lopez. Jackson accompanied him at his request and they ended up in Leister's bedroom preparing to smoke methamphetamine. To appellant's surprise, Jackson drew a knife across Leister's throat. Appellant held Leister and told her he was sorry and didn't know that would happen. Jackson directed him to discard their clothing. Appellant lied to the police when he told them that Leister was killed over drugs and was related to the Norteños. He made up that information because he wanted Jackson to be punished more severely. Appellant acknowledged that he became friends with Jackson in part because of their gang affiliation, although he denied being an actual Northerner or committing crimes for the Norteños. He denied asking Kinney to kill his girlfriend.

Resp. Ex. 1, California Court of Appeal Opinion (hereafter "Cal. Ct. App. Op."), at 2-7.

Petitioner appealed.  The California Court of Appeal affirmed and the California Supreme Court denied his petition for review.

Petitioner then filed this habeas action.  The habeas petition contained the following claims: (1) prospective jurors who were Native American were impermissibly challenged during jury selection, see Batson v. Kentucky, 476 U.S. 79 (1986); (2) the determination that the crime was committed for a "gang purpose" was made in violation of Munoz's rights under Apprendi v. New Jersey, 530 U.S. 466 (2000); (3) Munoz's right to due process was violated because there was insufficient evidence on the knowledge element necessary for the gang special circumstance determination; (4) the aiding and abetting jury instruction given violated his right to due process; and (5) cumulative error.

**STANDARD OF REVIEW**

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that

1  was contrary to, or involved an unreasonable application of, clearly established Federal law,

2  as determined by the Supreme Court of the United States; or (2) resulted in a decision that

3  was based on an unreasonable determination of the facts in light of the evidence presented in

4  the State court proceeding."  28 U.S.C. § 2254(d).

5      "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

6  court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

7  law or if the state court decides a case differently than [the] Court has on a set of materially

8  indistinguishable facts."  Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

9      "Under the 'unreasonable application' clause, a federal habeas court may grant the

10  writ if the state court identifies the correct governing legal principle from [the] Court's

11  decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at

12  413.  "[A] federal habeas court may not issue the writ simply because that court concludes in

13  its independent judgment that the relevant state-court decision applied clearly established

14  federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."

15  Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask

16  whether the state court's application of clearly established federal law was "objectively

17  unreasonable."  Id. at 409.

## DISCUSSION

19  A.    Batson Claim

20      Petitioner contends that the prosecutor exercised peremptory challenges against three

21  prospective witnesses because they were Native Americans.

22          1.    Background

23          Appellant, who is Native American, argues that he was denied a fair trial
    because the prosecution used its peremptory challenges to exclude three of the five
24  Native American prospective jurors on the panel and no Native Americans were
    seated on the jury.  [FN4.  In addition to the three jurors excused by peremptory
25  challenge, the court excused for hardship reasons prospective juror R.B., the tribal
    chairperson for the Elem Indian Colony. After the jury was sworn, but before opening
26  statements, the court excused for cause an alternate juror described by defense counsel
    as "the only Native American juror that we have" after it came to light that the juror
27  had failed to disclose information about his prior arrests and convictions. Appellant
    does not challenge the court's decision as to either of those two jurors.]  We disagree.

28

Both the state and federal Constitutions prohibit the use of peremptory challenges during voir dire to remove prospective jurors due to their presumed group bias based on membership in a racial, ethnic or other cognizable group. (J.E.B. v. Alabama ex rel. T.B. (1994) 511 U.S. 127, 129; Batson, supra, 476 U.S. at p. 89; Wheeler, supra, 22 Cal.3d at pp. 276-277.) Claims of discrimination are evaluated using a three-step analysis. First, a party objecting to a peremptory challenge on this basis must establish a prima facie case of group bias "'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" (Johnson v. California (2005) 545 U.S. 162, 168.) Second, the party making the allegedly discriminatory peremptory challenge must offer a justification for excusing the juror. (Ibid.) Third, the trial court must decide whether the party objecting to the challenge has shown that it was motivated by group bias. (Ibid.)

### 1. Proceedings Below

The prosecutor in this case exercised his third and fourth peremptory challenges against prospective jurors B.L. and J.L. B.L., a 58-year-old computer programmer with two grandchildren, stated on her written questionnaire that she was Native American. In response to questioning by the prosecutor during voir dire, she indicated that she had sat on a jury in an armed robbery case in 1990 that was unable to reach a verdict. When the prosecutor noted that she had not answered some of the questions on the questionnaire, including one asking whether she had had any positive or negative experiences with police officers, she stated she hadn't "had any contact either way." She thought she recognized defense counsel from a case in Clearlake in which she had been called for jury duty, but that case was dismissed and she did not think it would affect her ability to serve on the jury in appellant's case.

Juror J.L. was only briefly questioned during voir dire about the effect of medication he had mentioned in his questionnaire (which he stated he was no longer taking), but he provided detailed answers on many other subjects in his written questionnaire. A 66-year-old retired delivery truck driver with a history of other blue collar employment and some training in computers or business, he indicated, among other things, that he had been discharged from the military as "undesirable" in 1960 (though that status was "cleared" in 1972); that he had been prosecuted for auto theft in 1957 and was incarcerated for nine months; that he had been released from the army so the civilian authorities could pursue this case; that he had been a victim of domestic violence and did not believe he had been treated fairly when it was reported; and that he had been treated "quite badly" by Fremont police officers who apparently suspected him of some offense.

Defense counsel made a motion under Wheeler/Batson to challenge the dismissal of these two jurors, arguing that the prosecution had excused them because they were Native Americans. The prosecutor responded that he did not believe J.L. was Native American, but the trial court determined that a prima facie case had been made by the defense and called upon the prosecutor to state his reasons for the peremptory challenges.

The prosecutor explained that as to B.L., "She has a couple of prior marriages. She indicated that she had ... been a juror in [a] previous criminal case and they were unable to come to a verdict. I don't know if she was the hangup or if it was numerous people or what the problem was, but it causes me to have some concern. [¶] She did not answer the questions about whether-on her questionnaire about whether or not her prior jury service would influence the way she looks at the criminal justice system or whether or not it affected her desire to serve as a juror. [¶] She did not indicate with respect to question No. 35 whether or not that prior jury service experience, she would

be able to set that aside and decide the evidence presented at the trial in this case solely on the evidence presented. [¶] She also, on question 55, did not indicate whether or not she'd had any positive or negative experiences with police officers. [¶] With respect to whether or not she watches any programs related to police activities or investigation, she indicated that she does not watch any of those programs, which indicates to me that she does not have any interest in-at all in law enforcement, or at least causes me to have some concern that she might not, in combination with her failure to answer the questions about whether or not she'd had any positive or negative experiences with law enforcement officers. [¶] She indicated to me that she believed she met [defense counsel] before in Clearlake. I question whether or not-or she'd seen him in Clearlake.... I don't know if [defense counsel] has ever practiced law down in Clearlake. [¶] And then she also-I believe she had been in the county for some period of time, five years. She did not indicate that she knew any potential witnesses at all in this case. [¶] So the combination just causes me to have some doubts as to whether or not she would be a decent juror for the People in this case. And that, based on we've gone through I think 92 juror questionnaires, I had to make a list of people that I think would be the best jurors and those that wouldn't. And she was somewhat lower on the list than the people I would prefer to keep on the jury."

As to J.L., the prosecutor gave the following reasons: "Well, overall, I was just very uncomfortable-would be uncomfortable with him as a juror. I notice in his-different factors. He's been twice divorced. His reading-or his writing, I can't hardly read. He was discharged from the military as an undesirable. He indicates that it was since cleared in 1972, but I don't know what that means. He was at least initially in 1960 discharged from the military service as an undesirable. [¶] He has no experience serving as a juror in a criminal case. He has in the past been accused ... of auto theft. That was back in 1957. And he did admit that the was treated fairly in those cases, but that's just one other factor to consider. [¶] He indicated that he had previously been a victim of domestic violence and he doesn't-believes he wasn't treated fairly by law enforcement when it was reported, so I had some concern about whether or not he might be biased toward law enforcement because of that. [¶] He indicated, question no. 55, that he has had negative experiences with law enforcement. He didn't indicate that he had any positive experiences with law enforcement. [¶] And then the last thing would be that he's lived in this county six and a half years ... and he didn't indicate that he knew any potential witnesses in this case. This causes me to have some concern about whether or not he does any socializing or he's a loner or what. So it's that combination of things is the reason that I felt he would not be an appropriate juror for us."

After hearing the prosecutor's explanation, the court denied the <u>Batson/Wheeler</u> motion, concluding that B.L. and J.L. had been excused for race-neutral reasons stated by the prosecutor rather than because of their status as Native Americans. Voir dire continued, and included the questioning of prospective juror C.G.

On his questionnaire, C.G. indicated he would not be able to assess the testimony of a police officer using the same standards used to test the credibility of other witnesses. He noted that cops had a "budy code" [sic]. He could not be completely open minded and impartial because "wuder [sic] is he framed or did he do it?" He had seen the prosecutor before "on my cort [sic] case." Under questioning by counsel, C.G. stated that while he would not prejudge the case, he had strong feelings about the gang allegations and would have a hard time being impartial if the case involved a gang member attacking someone who was not part of the gang.

The prosecutor used a peremptory challenge to excuse C.G. and defense counsel made a second <u>Batson/Wheeler</u> motion, stating that he believed C.G. was

Native American based on his physical appearance and his membership in the California Indian Basket Weavers Association. Additionally, when asked whether he was a citizen of the United States in his questionnaire, he responded, "yes Y/Native." The prosecutor disputed that C.G. was Native American. He explained, however, that he had excused C.G. because of his limited intelligence, as evidenced by the responses to the questionnaire as well as the prosecutor's personal knowledge of him as a member of the community. The court concluded there was no prima facie showing that C.G. was Native American and denied the Batson/Wheeler motion on that basis.

Cal Ct. App. Op. at 8-12.

2.    Standard

The Equal Protection Clause forbids peremptory challenges of potential jurors solely on account of their race. Batson v. Kentucky, 476 U.S. 79, 89 (1986). A party may raise an equal protection claim on behalf of a juror excluded because of the juror's race, regardless of whether the party and the excluded juror share the same race. Powers v. Ohio, 499 U.S. 400, 406 (1991).

Under Batson, a violation of equal protection is established in a three-step process. Batson, 476 U.S. at 96-98. First, the defendant must make a prima facie case that the prosecutor exercised a peremptory challenge on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Id. at 93-94. Second, if the defendant makes a prima facie showing, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror in question. Id. at 94. Finally, if the prosecutor offers a race-neutral explanation for the challenge, the court must determine whether, despite the prosecutor's proffered explanation, the defendant has carried the burden of proving purposeful discrimination. Id. at 97-98. In doing so, the court evaluates the totality of the relevant facts. Ali v. Hickman, 571 F.3d 902, 908 (9th Cir. 2009).

3.    Analysis

a.    Prospective Juror CG

A party establishes a prima facie equal protection violation based on race by showing that: (1) The defendant is a member of a cognizable racial group, (2) the group's members have been excluded from the jury, and (3) the circumstances of the case raise an inference that the exclusion was based on race. Batson, 476 U.S. at 96. Here, the trial court found that

there was no prima facie case because petitioner had not established that C.G. was Native American.

The California Court of Appeal rejected the <u>Batson</u> claim as to C.G., saying:

> Turning first to the prosecutor's peremptory challenge made to C.G., we consider whether substantial evidence supports trial court's conclusion that there was no prima facie case of discrimination because the defense did not demonstrate C.G. was in fact Native American. (<u>People v. Smith</u> (2005) 35 Cal.4th 334, 346-347.) The defense pointed to three circumstances suggesting C.G. was a Native American: his physical appearance, his membership in an Indian Basket Weavers group and his description of his American citizenship as "Native." The trial court was in the best position to assess C.G.'s physical appearance, and we defer to its implicit conclusion that C.G. was not obviously a Native American. There was no showing that membership in the basket weaving association required tribal membership or Native American heritage. Finally, the reference to "Native" citizenship appears more likely to be an indication that C.G. acquired his United States citizenship at birth rather than through naturalization. Substantial evidence supports the court's conclusion that the defense failed to demonstrate the juror's membership in a cognizable class. [FN5. Although we need not reach the issue, we note that the jury questionnaire submitted by C.G. was replete with grammar and spelling errors. The overall tenor of the questionnaire responses tends to support the prosecutor's explanation that he excused C.G. because he believed he did not have the intellectual sophistication desirable in a juror hearing a complex murder trial.]

Cal. Ct. App. Op. at 12.

The evidence as to CG's race was: (1) defense counsel's statement that he "believe[d]" CG to be Native American, based on his appearance; (2) the prosecutor's insistence, based on having lived in the community for forty years and having "seen [CG] around a lot," that CG in fact was not Native American; (3) CG's statement on his juror questionnaire that he was a member of the "California Indian Basket Weavers Association;" (4) CG's answer on his questionnaire to the question "[a]re you a citizen of the United States?," to which he answered: "yes Y/NATive.[capitalization in original];" and (5) the trial court's finding (presumably based at least in part on the court's personal observation of CG) that "there's not a prima facia [sic] showing that this juror is a Native American or a member of any class to which <u>Wheeler-Batson</u> would apply."  Ex. 5 (Augmented Reporter's Transcript), part 12 at 280-83.

On this record, the state courts that reviewed the trial court's ruling certainly could have reached the opposite conclusion, there being evidence on both sides of the question, but whether they could have done so is not the question here – because whether a challenged

juror is a member of a cognizable racial group is a question of fact, this court can grant relief

on this claim only if the state court's finding was "an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  The

trial court's own observation; the prosecutor's opinion, based on knowing CG in the

community; and the ambiguity of the evidence on the other side, all support the conclusion

that the state court's finding of fact was not unreasonable.  The *Batson* claim is without merit

as to CG.

        b.      <u>Prospective Jurors  B.L. and J.L.</u>

        The prosecutor in this case exercised his third and fourth peremptory challenges against prospective jurors B.L. and J.L. B.L., a 58-year-old computer programmer with two grandchildren, stated on her written questionnaire that she was Native American. In response to questioning by the prosecutor during voir dire, she indicated that she had sat on a jury in an armed robbery case in 1990 that was unable to reach a verdict. When the prosecutor noted that she had not answered some of the questions on the questionnaire, including one asking whether she had had any positive or negative experiences with police officers, she stated she hadn't "had any contact either way." She thought she recognized defense counsel from a case in Clearlake in which she had been called for jury duty, but that case was dismissed and she did not think it would affect her ability to serve on the jury in appellant's case.

        Juror J.L. was only briefly questioned during voir dire about the effect of medication he had mentioned in his questionnaire (which he stated he was no longer taking), but he provided detailed answers on many other subjects in his written questionnaire. A 66-year-old retired delivery truck driver with a history of other blue collar employment and some training in computers or business, he indicated, among other things, that he had been discharged from the military as "undesirable" in 1960 (though that status was "cleared" in 1972); that he had been prosecuted for auto theft in 1957 and was incarcerated for nine months; that he had been released from the army so the civilian authorities could pursue this case; that he had been a victim of domestic violence and did not believe he had been treated fairly when it was reported; and that he had been treated "quite badly" by Fremont police officers who apparently suspected him of some offense.

        Defense counsel made a motion under *Wheeler/Batson* to challenge the dismissal of these two jurors, arguing that the prosecution had excused them because they were Native Americans. The prosecutor responded that he did not believe J.L. was Native American, but the trial court determined that a prima facie case had been made by the defense and called upon the prosecutor to state his reasons for the peremptory challenges.

        The prosecutor explained that as to B.L., "She has a couple of prior marriages. She indicated that she had ... been a juror in [a] previous criminal case and they were unable to come to a verdict. I don't know if she was the hangup or if it was numerous people or what the problem was, but it causes me to have some concern. [¶] She did not answer the questions about whether-on her questionnaire about whether or not her prior jury service would influence the way she looks at the criminal justice system or whether or not it affected her desire to serve as a juror. [¶] She did not indicate with

respect to question No. 35 whether or not that prior jury service experience, she would be able to set that aside and decide the evidence presented at the trial in this case solely on the evidence presented. [¶] She also, on question 55, did not indicate whether or not she'd had any positive or negative experiences with police officers. [¶] With respect to whether or not she watches any programs related to police activities or investigation, she indicated that she does not watch any of those programs, which indicates to me that she does not have any interest in-at all in law enforcement, or at least causes me to have some concern that she might not, in combination with her failure to answer the questions about whether or not she'd had any positive or negative experiences with law enforcement officers. [¶] She indicated to me that she believed she met [defense counsel] before in Clearlake. I question whether or not-or she'd seen him in Clearlake.... I don't know if [defense counsel] has ever practiced law down in Clearlake. [¶] And then she also-I believe she had been in the county for some period of time, five years. She did not indicate that she knew any potential witnesses at all in this case. [¶] So the combination just causes me to have some doubts as to whether or not she would be a decent juror for the People in this case. And that, based on we've gone through I think 92 juror questionnaires, I had to make a list of people that I think would be the best jurors and those that wouldn't. And she was somewhat lower on the list than the people I would prefer to keep on the jury."

As to J.L., the prosecutor gave the following reasons: "Well, overall, I was just very uncomfortable-would be uncomfortable with him as a juror. I notice in his-different factors. He's been twice divorced. His reading-or his writing, I can't hardly read. He was discharged from the military as an undesirable. He indicates that it was since cleared in 1972, but I don't know what that means. He was at least initially in 1960 discharged from the military service as an undesirable. [¶] He has no experience serving as a juror in a criminal case. He has in the past been accused ... of auto theft. That was back in 1957. And he did admit that the was treated fairly in those cases, but that's just one other factor to consider. [¶] He indicated that he had previously been a victim of domestic violence and he doesn't-believes he wasn't treated fairly by law enforcement when it was reported, so I had some concern about whether or not he might be biased toward law enforcement because of that. [¶] He indicated, question no. 55, that he has had negative experiences with law enforcement. He didn't indicate that he had any positive experiences with law enforcement. [¶] And then the last thing would be that he's lived in this county six and a half years ... and he didn't indicate that he knew any potential witnesses in this case. This causes me to have some concern about whether or not he does any socializing or he's a loner or what. So it's that combination of things is the reason that I felt he would not be an appropriate juror for us."

After hearing the prosecutor's explanation, the court denied the *Batson/Wheeler* motion, concluding that B.L. and J.L. had been excused for race-neutral reasons stated by the prosecutor rather than because of their status as Native Americans.

Cal. Ct. App. Op. at 8-11.

The court of appeal rejected petitioner's claims as to these two prospective jurors, saying:

Several race-neutral reasons suggest that J.L. would not have been a desirable juror for the prosecution. He had been dishonorably discharged from the military, charged with and apparently convicted of theft (his questionnaire indicated that he served time in the Deuel Vocational Institute), and he had had negative experiences with law enforcement. Additionally, while the trial court had found a prima facie case

necessitating an explanation from the prosecutor, it was entitled to credit the prosecutor's explanation that he did not believe J.L. was a Native American. From these circumstances, the court could reasonably conclude the peremptory challenge of J.L. was not motivated by presumed group bias based on his (possible) Native American heritage.

Appellant offers a number of arguments as to why the reasons relied upon to dismiss J.L. were pretextual: (1) J.L.'s status as someone who had been twice divorced could not have been a valid reason when the prosecutor accepted two jurors who had been twice divorced and four jurors who had been once divorced; (2) the prosecutor's claim that J.L.'s handwriting on his questionnaire was illegible was not supported by the record; (3) the prosecutor did not ask J.L. for clarification about his discharge from the military, even though he relied on this as a reason to dismiss J.L. from jury service; (4) J.L.'s lack of experience in serving on a criminal trial could not have been a valid reason when a number of jurors accepted by the prosecution had no criminal jury experience either; (5) it was "implausible" the prosecutor would rely on a 50-year-old theft accusation to excuse a juror; (6) one juror accepted by the prosecution also reported a negative experience with law enforcement; (7) J.L.'s noted unfamiliarity with any of the witnesses in the case, despite his residency in Lake County, was not a legitimate reason when nine of the fourteen jurors and alternates who were seated similarly did not know any witnesses and in any event, knowing a witness was a circumstance that would just as easily trigger a challenge.

Appellant's use of a comparative juror analysis does not persuade us that the trial court erred in denying the *Batson/Wheeler* motion. It is clear from the prosecutor's explanation that he did not rely on any single circumstance when he excused J.L. It is equally clear that while some of the reasons given by the prosecutor for excusing J.L. applied to other jurors who were ultimately seated, none of the seated jurors had the same combination of characteristics as J.L. "While an advocate may be concerned about a particular answer, another answer may provide a reason to have greater confidence in the overall thinking and experience of the panelist. Advocates do not evaluate panelists based on a single answer. Likewise, reviewing courts should not do so." (*People v. Lenix*, *supra*, 44 Cal.4th at p. 631; *see also People v. Cruz* (2008) 44 Cal.4th 636, 660.)

Cal. Ct. App. Op. at 13-14.

The trial court's ruling that the strikes were not discriminatory was a ruling on the third step of the <u>Batson</u> trio. The findings of the state trial court on that issue – discriminatory intent – are findings of fact entitled to the presumption of correctness in federal habeas review. <u>Purkett v. Elem</u>, 514 U.S. 765, 769 (1995). So are the findings, if any, of the state appellate court. <u>Mitleider v. Hall</u>, 391 F.3d 1039, 1050 (9th Cir. 2004); <u>Williams v. Rhoades</u>, 354 F.3d 1101, 1108 (9th Cir. 2004). The petitioner must show the state court's conclusion to be "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." <u>Id.</u> (citing 28 U.S.C. § 2254(d)(2)); <u>see also</u> <u>Kesser v. Cambra</u>, 465 F.3d 351, 368 (9th Cir. 2006) (finding that California Court of

1    Appeal's conclusion that a strike was not racially based was unreasonable determination

2    under 28 U.S.C. § 2254(d)(2)).  Therefore, a federal habeas court can only grant habeas relief

3    "if it was unreasonable to credit the prosecutor's race-neutral explanations for the Batson

4    challenge."  Rice v. Collins, 546 U.S. 333, 338 (2006).

5         For prospective juror J.L., the prosecutor's explanation included the facts that J.L. had

6    been convicted of a felony and served time, albeit a long time ago, and had stated on the jury

7    questionnaire that he was not treated fairly by the police.  Furthermore, because these facts

8    were true of no one who was chosen to serve on the jury, comparative juror analysis is

9    irrelevant to this strike.  Given how important these facts would be to a prosecutor, the state

10   courts were not unreasonable in rejecting this claim.

11        As to prospective juror B.L., the court of appeal said:

12             We finally consider the prosecutor's challenge to B.L. The court could
               reasonably conclude that the prosecutor excused B.L. for the nondiscriminatory
13             reasons stated: among other things, that she had previously sat on a criminal jury that
               had not reached a verdict, that she did not watch television shows about the police,
14             suggesting a lack of interest in law enforcement, and that she had not given answers
               on the questionnaire about positive or negative experiences with law enforcement. It is
15             true that unlike J.L. and C.G., B.L. did not describe experiences or express views
               suggesting an overt antipathy toward law enforcement or the authorities. But the
16             prosecutor's explanation shows that while he did not necessarily believe B.L. was
               unsuitable as a juror, he had concluded that there were others on the panel of 92
17             people who would make better jurors from the prosecution's perspective. This was a
               plausible explanation in light of her responses when they are viewed as a whole.
18

19   Cal. Ct. App. Op. at 14-15.

20        The prosecutor said that he had exercised the strike based on "a combination of

21   things."  Ex. 5, part 11 at 233.  His "primary concern" was that B.L. had previously sat on a

22   criminal jury that did not reach a verdict, and, a related point, that she had not answered the

23   question on the jury questionnaire whether her prior jury experience had affected her attitude

24   to law enforcement and whether she could set aside her previous jury experience and decide

25   the case on only the evidence presented at the trial.  Id. at 234.  The other reasons he gave for

26   the strike were that (1) B.L. had "a couple of prior marriages;" (2) she did not watch

27   television shows about the police, suggesting a lack of interest in law enforcement; (3) she

28   had not given answers on the questionnaire about positive or negative experiences with law

14

enforcement; (4) she thought she had seen the defense attorney in Clearlake, the implication

being that her recollection was incorrect; and (5) she had lived in Clearlake for five years but

did not know any of the potential witnesses.  Id. at 234-35.  In summary, "the combination

just caused me to have some doubts as to whether or not she would be a decent juror for the

People in this case.  And that, based on we've gone through I think 92 jury questionnaires, I

had to make a list of people that I think would be the best jurors and those that wouldn't.

And she was somewhat lower on the list than the people I would prefer to keep on the jury."

Id. at 235.

The reasons given by the prosecutor for the strike are not discriminatory on their face.

Thus the question is whether they were pretextual, a disguise for racism.

Petitioner argued on appeal that comparative juror analysis showed that these reasons

were pretextual.  The court of appeal addressed the point:

> As with J.L., appellant argues that a number of circumstances suggest
> the reasons offered to exclude B.L. were pretextual: (1) the fact she had "a
> couple" of prior marriages was not a valid reason when two alternate jurors had
> been divorced twice and other jurors had been divorced once; (2) the
> prosecution could not have reasonably relied on her prior jury experience on a
> criminal case where no verdict was reached when two other jurors whom he
> accepted had served on juries that did not return a verdict; (3) the prosecutor's
> observation that B.L. had not answered some questions on the questionnaire
> was equally true of other jurors, and could not have been an actual reason for
> excusing B.L. when he did not follow up on voir dire by asking her about the
> omitted responses; (4) though the prosecutor noted that B.L. had not answered
> a question on the questionnaire as to whether she had had any positive or
> negative experiences with law enforcement, six seated jurors had not answered
> the same question and the prosecutor failed to ask B.L. any follow-up questions
> on the subject; (5) other jurors who were accepted did not watch television
> police shows; (6) the record did not support the prosecution's stated assumption
> that B.L. was untruthful or mistaken about seeing defense counsel in the
> Clearlake courthouse; (7) it was anomalous to rely on B.L.'s indication that she
> did not know any potential witnesses when a number of the jurors seated also
> did not know any witnesses and there was no reason "a law-abiding 58-year old
> grandmother would know any witnesses here."
>
> The ultimate question is not whether the prosecutor was correct in his
> assessment of B.L.'s desirability as a juror, but whether he excused her for a
> discriminatory reason. The prosecutor is presumed to use peremptory challenges in a
> constitutional manner and deference is given to the court's ability to distinguish "bona
> fide reasons" from "sham excuses." (*People v. Avila* (2006) 38 Cal .4th 491, 541.)
> Though it is possible to parse the individual reasons given by the prosecution and
> conclude many of those reasons applied to other jurors, appellant acknowledges that
> none of the seated jurors shared the particular combination of traits that the prosecutor
> found worrisome. "[P]otential jurors are not products of a set of cookie cutters."

1    (*Miller-El II*, *supra*, 545 U.S. at p. 247, fn. 6.) "Two panelists might give a similar
2    answer on a given point. Yet the risk posed by one panelist might be offset by other
     answers, behavior, attitudes or experiences that make one juror, on balance, more or
3    less desirable. These realities, and the complexity of human nature, make a formulaic
     comparison of isolated responses an exceptionally poor medium to overturn a trial
4    court's factual finding." (*Lenix*, *supra*, at p. 624; *see also Jurado*, *supra*, 38 Cal.4th at
     p. 105.)

5    Cal. Ct. App. Op. at 14-16.[1]

6            Comparative juror analysis -- i.e., determining whether non-challenged jurors possess

7    any of the characteristics on which the prosecution challenged jurors in the protected group --

8    may tend to prove discrimination at the third <u>Batson</u> step.  <u>Snyder v. Louisiana</u>, 552 U.S.

9    474, 483-84 (2008); <u>Miller-El v. Dretke</u>, 545 U.S. 231, 242-43 (2005) ("<u>Miller-El II</u>");

10   <u>Kesser v. Cambra</u>, 465 F.3d 351, 360 (9th Cir. 2006).  Here the court of appeal did conduct a

11   comparative juror analysis, and impliedly concluded that the analysis did not show pretext

12   because none of the seated jurors had the same combination of traits listed by the prosecutor

13   as those giving rise to his strike of B.L.  This was, at a minimum, a different approach than

14   that in <u>Miller-El II</u>, where the Court engaged in a more sophisticated analysis.  In comparing

15   two stricken African-American jurors with white jurors who were seated, the Court noted

16   that "when we look for nonblack jurors similarly situated to [the stricken juror], we find

17   strong similarities as well as some differences.  [footnote omitted]  But the differences seem

18   far from significant . . . ."  <u>Id.</u> at 247.  A hypothetical example: if a prosecutor were to give

19   reasons one through six for striking a juror in a protected class, and a seated juror were

20   similar on points one through five but differed as to reason six, that would not end the

21   inquiry.  If reason six was frivolous or otherwise insubstantial, that a juror was seated who

22   was similar on the other five points would be evidence of discrimination.  The court of

23   appeals here did not do that, but the sketchiness of the court of appeal's rationale is

24   irrelevant, because in a very recent case, the United States Supreme Court made clear that in

25   applying the AEDPA a federal habeas court looks only to the result reached in state court,

26   not the reasoning the state court used in reaching that result.  <u>Harrington v.Richter</u>, 131 S.Ct.

27   770, 784-85 (2011).   It is the petitioner's burden to show there was no reasonable basis for

28   the state court's denial of relief.  <u>Id.</u>

Here, reason three, the prosecutor's doubt about the accuracy of B.L.'s belief she had seen the defense attorney in Clearlake, is weak, but not complete nonsense – a suspicion that a juror could not accurately recall facts could be a valid concern.  Reason four, that B.L. did not know any of the witnesses that were going to appear at trial, is inexplicable.  As to reason one, comparative juror analysis shows that two jurors who were not stricken had been divorced twice, as had B.L., so reason one is not strong by itself.  See Ex. 4 (clerk's transcript, 2d supplemental) at 231, 250.  Neither of the twice-divorced seated jurors had served on a hung jury, however.  Id. at 234, 253.

The other reasons are more substantial.  They fall into two groups, about prior jury experience and attitude to law enforcement.  B.L. had served on a hung jury and did not answer the question on the jury questionnaire asking whether she could set aside her prior jury experience in deciding this case, and she did not answer the questionnaire questions about whether her prior jury experience had affected her attitude towards the police and whether she had any positive or negative feelings about law enforcement.  She also said that she did not watch police shows on television.  Both these groups of reasons are nondiscriminatory; the question is whether comparative jury analysis shows that they are pretextual.

Petitioner contended on appeal that various of the jurors who were seated had the same traits that the prosecutor found objectionable in B.L.  Pet., attached "Opening Brief on Appeal" at 21-43.  However, he does not, and on this record cannot, point to a seated juror who matched B.L. as to the two main reasons given by the prosecutor for the strike, namely (1) that B.L. had sat on a hung jury and was reluctant to say what effect that might have on her service in this case, and (2) that she was reluctant to say what her attitude was towards law enforcement.  Comparative jury analysis does not show that the prosecutor's main reasons were pretextual.

Two points are particularly important here: for one, the prosecutor emphasized that his strike was motivated by a "combination" of the factors he listed; that some might be weak is not decisive.  Secondly, the prosecutor explained how he had ranked ninety-two juror

questionnaires in the order of his preference, and that B.L. was "somewhat lower" on the list than some others; that is, she was not a juror he was determined to strike, but only that she was not as desirable (from a prosecution point of view) as some others.

This case is somewhat similar to Cook v. Lamarque, 593 F.3d 810 (9th Cir.2010), because there, as here, some of the reasons given for a strike were strong, while others, though not discriminatory, were weak.  As in Cook, "the prosecutor gave both persuasive dnd unpersuasive justifications for his strikes."  Id. at 826.  And as in Cook, "the most significant justifications . . . were entirely sound," and as in Cook, the court finds that the strike was not "motivated in substantial part by discriminatory intent."  See id.  This claim is without merit.

B.    Apprendi Claim

Petitioner contends that the only evidence that he was an active gang member or that the crime was committed for a gang-related purpose was his out-of-court statements, and thus that evidence at trial was not sufficient to satisfy California's corpus delicti rule.  The court of appeal noted that several California courts had held that the corpus delicti rule does not apply to non-felony murder special circumstances, reasoning that the rule need only satisfy proof of the underlying felony.  The jury only reaches the question of special circumstances after the crime has been proven.  Thus, the "danger of a conviction when there was no crime cannot arise" at the special circumstances stage. Cal. Ct. App. Op. at 20.  The court of appeal then quoted approvingly the California Supreme Court's holding in People v. Hamilton, 48 Cal.3d 1142, 2256 (1989),  that "the corpus delicti doctrine does not bar proof of the special circumstances...."   Nevertheless, the court in this case found sufficient evidence at trial to prove the corpus delicti both with respect to the murder and the special circumstance charged.  Cal. Ct. App. Op. at 20-21.

Petitioner attempts to bootstrap what obviously is a state-law claim into a federal one by contending that the purported lack of at-trial evidence of the corpus delicti was a violation of the rule set out in Apprendi v. New Jersey, 530 U.S. 466 (2000).  In Apprendi the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a

crime beyond the prescribed statutory maximum must be submitted to a jury, and proved

beyond a reasonable doubt." Id. at 466, 490 (2000). Petitioner does not develop his

argument that Apprendi applies, but presumably it would be that the Apprendi rule somehow

incorporates state law, so any fact that increases a defendant's ultimate sentence must not

only be found by the jury beyond a reasonable doubt – as it was here – but also found in

conformity with state law. Aside from the doubtful validity of the predicate, the flaw in this

reasoning is obvious: the court of appeal, whose holdings as to state law are binding on this

court, see Bradshaw v. Richey, 546 U.S. 74, 76 (2005), held that there was no state law

violation. Cal. Ct. App. Op. at 21. Thus, to the extent there is any federal claim here at all, it

is without merit.

C.     Sufficiency of the Evidence

       Petitioner contends that there was insufficient evidence on a knowledge element that

he contends is necessary for a gang special circumstance determination.

       The court of appeal summarized California law applicable to this claim and the factual

background:

> The criminal street gang special circumstance applies when "The
> defendant intentionally killed the victim while the defendant was an active
> participant in a criminal street gang, as defined in subdivision (f) of Section
> 186.22, and the murder was carried out to further the activities of the criminal
> street gang." (§ 190.2, subd .(a)(22).) Section 186.22, subdivision (f) defines
> criminal street gang as "any ongoing organization, association, or group of
> three or more persons, whether formal or informal, having as one of its primary
> activities the commission of one or more of the criminal acts [enumerated
> offenses including murder and attempted murder], having a common name or
> common identifying sign or symbol, and whose members individually or
> collectively engage in or have engaged in a pattern of criminal gang activity."
> A "pattern of criminal gang activity" is statutorily defined as "the commission
> of, attempted commission of, conspiracy to commit, or solicitation of ... two or
> more" enumerated offenses. (§ 186.22, subd. (e).) "Active participation" (f) in a
> gang requires involvement that is "more than nominal or passive." ( People v.
> Lamas (2007) 42 Cal.4th 516, 523.)
>
> Matthew Buechner, a special agent for the California Department of
> Corrections and Rehabilitation, testified as the prosecution's gang expert. His
> unit was in charge of validating gang members in prison and he was familiar
> with the structure of prison gangs and their street gang counterparts. The
> Nuestra Familia is a highly organized Northern California prison gang that
> developed in response to the Mexican Mafia. It controlled the Norteños, a
> statewide criminal street gang whose members act as soldiers for Nuestra
> Familia outside of prison, as well as so-called "Northerners," associates who

were sympathetic to the cause of Nuestra Familia but were not necessarily gang members. Norteños provide income to Nuestra Familia through drug sales and carried out violent acts on its behalf. There are over 10,000 Norteños, who are divided into various territorial subsets but operate under the umbrella of Nuestra Familia. Norteños are associated with the number "14" because "N" is the 14th letter of the alphabet, whereas Sureños, associated with the Mexican Mafia, are associated with the number "13."

Prison packets were introduced through Buechner's testimony that described three crimes qualifying as the predicate acts necessary to establish that members of the Norteños had engaged in a pattern of criminal gang activity, i.e., had committed two or more enumerated offenses. Rodolpho Torrez, a validated Norteño, was convicted of murder with a gang enhancement based on his killing of another Norteño during a party after a high school prom in Sacramento in 2000. Justin Howe, a validated member of the Oakpark Norteño gang, was convicted of attempted murder after he challenged another man at a gas station in Sacramento and stabbed him three times. Rocky Gonzales, a validated Norteño, was convicted of murder with a gang enhancement after he and some companions approached two men in a convenience store in Sacramento in 2001 and called them "scraps," a derogatory reference to Sureños. A fistfight ensued and the two victims were shot, one of them fatally.

Buechner opined that appellant was a member of the Norteños based on a number of circumstances: appellant had tattoos that included the number "14," he had admitted being a Norteño in 1999 and 2002 when interviewed by law enforcement, he had admitted membership during a classification intake interview in 2002, and he had acknowledged participating in the discipline of other Norteño gang members when he was incarcerated at the California Youth Authority.

Cal. Ct. App. Op. at 22-23.

As to the claim presented here, the court of appeal held:

Appellant argues that the prosecution failed to prove that when he killed Leister, he knew members of the Norteños engaged in criminal gang activity. Assuming without deciding that such knowledge is an element of the criminal street gang special circumstance (compare § 186.22, subd. (a) ["knowledge that its members engage in or have engaged in a pattern of criminal gang activity" is an element of the substantive offense of gang participation] with § 190.2, subd. (a)(22) [no separate element of knowledge so long as crime is committed for benefit of gang] ), substantial evidence was presented that appellant knew the Norteños had engaged in a pattern of criminal gang activity. He admitted to Detective Hermann during his interrogation in this case that he was a Northerner, that Northern "homies" from Pelican Bay prison had ordered Leister's killing, and that he feared he would be killed if he did not do what they asked him to do, thus demonstrating his awareness of their criminal acts.

Id. at 24-25.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

1   charged." In re Winship, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the

2   evidence in support of his state conviction cannot be fairly characterized as sufficient to have

3   led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a

4   constitutional claim, Jackson v. Virginia, 443 U.S. 307, 321 (1979), which, if proven, entitles

5   him to federal habeas relief, id. at 324.  The federal court determines only whether, "after

6   viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

7   could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319.

8   Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt,

9   may the writ be granted. Id. at 324.  When considering a sufficiency of the evidence claim

10  the Court must "view[] the evidence in the light most favorable to the prosecution," Jackson,

11  443 U.S. at 319, and so must assume that the jury believed the prosecution's witnesses.

12          As the court of appeal noted, petitioner told a detective that he was a Northerner, that

13  Northern "homies" from Pelican Bay prison had ordered Leister's killing, and that he feared

14  he would be killed if he did not do what they asked him to do.  Cal. Ct. App. Op. at 25.

15  Rational jurors could have found from this that petitioner knew the Norteños were a criminal

16  street gang.  This claim is without merit.

17  D.    Aiding and Abetting Instruction

18          Petitioner contends that his due process rights were violated by the trial court's giving

19  an allegedly defective aiding and abetting instruction.

20          The court of appeal declined to decide whether the "special instruction had the

21  potential to be misleading," because it concluded that any error was harmless:

22          The presentation of a legally inadequate theory of guilt does not require
            reversal when it is possible to determine from other portions of the verdict that

23          the jury necessarily convicted the defendant based on a legally correct theory. (
            People v. Chavez (2004) 118 Cal.App.4th 379, 390; People v. Guiton (1993) 4

24          Cal.4th 1116, 1130.) Here, the jury returned a true finding on the allegation that
            appellant personally used a deadly or dangerous weapon (a knife) under section

25          12022, subdivision (b)(1). In so doing, it necessarily and unanimously
            concluded that appellant was a direct perpetrator, and not merely an aider and

26          abettor. Any error in the prosecution's special instruction was harmless beyond
            a reasonable doubt. (See People v. Flood (1998) 18 Cal.4th 470, 502-503

27          [instruction that misstates element of offense subject to review under
            harmless-beyond-a-reasonable-doubt standard of Chapman v. California (1967)

28          386 U.S. 18, 24].)  [FN6. Although the instruction on the knife use allegation

stated that a person "uses a deadly or dangerous weapon" if he or she "displays the weapon in a menacing manner" or "stabs someone with the weapon," there was no evidence from which a rational jury could have concluded that appellant merely displayed a knife in a menacing manner for the purpose of aiding and abetting the killing. In finding the knife use allegation true, the jury determined that appellant stabbed Leister.]

Cal. Ct. App. Op. at 17-18.

When, as here, a state court disposes of a claim of a constitutional error as harmless under Chapman, a federal habeas court may, for purposes of application of the "unreasonable application" clause of § 2254(d)(1), determine whether the state court's harmless error analysis was objectively unreasonable. See Medina v. Hornung, 386 F.3d 872, 878 (9th Cir. 2004). If the state court's decision does not rise to the level of objective unreasonableness, no relief is warranted. See, e.g., Ponce v. Felker, 606 F.3d 596, 606 (9th Cir. 2010) (finding state court's harmlessness determining was not unreasonable and proceeding no further)); Campbell v. Rice, 408 F.3d 1166, 1173 (9th Cir. 2005) (same). Here the state court's harmless error holding was clearly reasonable, given that the jury found that petitioner personally used a knife, so this claim is without merit.

E.    Cumulative Error

Petitioner alleges that his above claims, even if they do not amount to constitutional error in themselves, when added together show that the trial as a whole was a violation of due process, i.e., he claims cumulative error. But when there is no constitutional error, there is nothing to cumulate. Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002). This claim therefore is without merit.

F.    Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability in the ruling. See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability. See 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A judge shall grant a certificate of appealability "only if the applicant has made a

1  substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The

2  certificate must indicate which issues satisfy this standard. See id. § 2253(c)(3). "Where a

3  district court has rejected the constitutional claims on the merits, the showing required to

4  satisfy § 2253(c) is straightforward: the petitioner must demonstrate that reasonable jurists

5  would find the district court's assessment of the constitutional claims debatable or wrong."

6  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

7        The Court concludes that a certificate of appealability should issue on petitioner's first

8  issue, the Batson issue. A certificate will be denied as to the other issues.

9                                    **CONCLUSION**

10       The petition for writ of habeas corpus is DENIED on the merits. A certificate of

11  appealability is GRANTED as to the Batson issue only. The clerk shall close the file.

12       IT IS SO ORDERED.

13  DATED: February 15, 2011.                    _____
                                                 Marilyn Hall Patel
14                                               United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23

1

2

**ENDNOTES**

3
4
5
6

1. The comparative juror analysis by the California Court of Appeal as to this juror would be incorrect if the opinion were read to mean that the jurors to be compared must be identical in all respects.  That proposition was rejected in <u>Miller-El II</u>.  <u>Miller-El II</u>, 545 U.S. at 247 n.6.  The Supreme Court did not reject the proposition – one that is nearly self-evident – that the value of comparative juror analysis is affected by similarity of the jurors being compared as to all the factors listed by the prosecutor as reasons for the strike.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28